IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | Case No. 21-CR-000049 (TSC) |
| | : | |
| **EDWARD E. HEMENWAY, II** | : | |
| | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Edward E. Hemenway, II to 30 days' incarceration and $500 restitution.

### I.     Introduction

Co-defendants Edward Hemenway and Robert Bauer, who are cousins, participated together in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.

Hemenway and Bauer each pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, and Picketing in the Capitol Building. As explained herein, Hemenway and Bauer were together the entire time they were inside (and outside) the Capitol. They also each have serious criminal histories. For these reasons, we are requesting the same sentence for each.

Regarding Hemenway, the government is requesting a period of incarceration based on the fact that: (1) Hemenway treated the chaos and disorder around him as an entertaining spectacle, even posing for a selfie-style photograph in a mob of people inside the Capitol with his middle finger raised; (2) Hemenway remained inside the Capitol for a brief period of time – approximately 17 minutes – yet made his way into the Crypt, where police officers were being attacked; (3) Hemenway admitted to his actions only a few days after the riot and accepted responsibility early through a plea agreement; (4) Hemenway has expressed remorse for his actions; and (5) Hemenway has a serious criminal history involving a conviction for Sexual Battery.

## II. Background

### A. Factual Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense (ECF No. 23) at pp. 1-3. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers."). With that backdrop, we turn to Hemenway's conduct and behavior on January 6.

*Edward Hemenway's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Edward Hemenway along with his cousin Robert Bauer and Bauer's wife attended the "Stop the Steal" rally at the Ellipse. After the rally, they followed the crowd on Pennsylvania Avenue to the Capitol. When they arrived at the Capitol, Bauer's wife needed to use

the restroom, so she left to go to their hotel.[1] Rather than leave the Capitol grounds with her, both Bauer and Hemenway chose to stay at the Capitol, despite the growing chaos around them.

CCTV footage from U.S. Capitol Police shows Hemenway enter the Capitol at about 2:19 p.m.[2] through the Senate Wing Door, as shown here:



Bauer entered about a second before Hemenway. They then turned right and walked down a hallway that led into the Crypt.

At about 2:20 p.m. CCTV captured Bauer and Hemenway together in the Crypt with a mob of other rioters. Bauer took several photographs in the Crypt, which he later provided to the FBI, including this selfie-style photograph showing their elation in the moment:

---

[1] According to Hemenway, his wife and child were also at the hotel.
[2] The Statement of Offense (ECF 26) states that Hemenway entered the building at about 2:10 p.m. Further review of the CCTV footage shows that Hemenway entered at about 2:19 p.m.



At 2:32 p.m., CCTV captured both defendants in the "Office of the Attending Physician corridor" with other rioters, which is on the same level as the Crypt. They then exited the building through the Memorial Door at about 2:36 p.m. In all, Hemenway and Bauer were inside the Capitol for about 17 minutes.[3]

Once outside, Hemenway took this photograph standing on a military-style government vehicle with his arms raised in triumph:

---

[3] The government does not currently have evidence of Hemenway or Bauer engaging in acts of physical violence or destruction of property while in the Capitol.



*Hemenway's Interview with the FBI*

On January 11, 2021, Hemenway voluntarily spoke with the FBI. The interview was recorded. During the interview, Hemenway stated that before the riot he heard "people talking all over social media. I heard crazy things. I heard good things." He said that he and Bauer went to the "Stop the Steal" rally and heard former-President Trump talk. From there, he and Bauer walked down Pennsylvania Avenue to the Capitol.

As they arrived at the Capitol, Hemenway heard a loud bang and saw "a green plastic [sign]" that said, "Do Not Enter." He "pointed it out to [Bauer] and was like, what the hell."

5

Hemenway said that he could see S.W.A.T. team members near scaffolding, and that he entered a door next to the scaffolding. When he entered the Capitol, Hemenway did not believe that the Vice President or Congressional members were in the building and remarked, "I can't imagine that they would leave the Vice President in there with people going inside."

Once inside the building, Hemenway claimed that he was "greeted by . . . a S.W.A.T. guy. He shook my hand." Hemenway described the officer as dressed in "all black" and "wearing tactical gear." Hemenway said that he told the officer, "sorry," because "it was f**king crazy. It was pretty f**ing wild." The officer said, "It's your house now."[4] Hemenway said that he thought rioters were "fighting cops at that point."

According to Hemenway, they then walked down a hallway looking for a bathroom, when they saw another rioter break into a locked office with a PIN pad on the door. Inside the office was a large television and family pictures. When Hemenway saw the family pictures he thought, "Jesus Christ. What the f**k are we doing." From there, they left the building.

Once outside, Hemenway said that they took some photographs. After taking photographs, Hemenway said that they walked up a level and saw a rioter trying to break a window and he yelled at the rioter to stop. Hemenway believed that they left the Capitol at around 3:30 p.m.

Hemenway said that he entered the Capitol out of "curiosity" and "stupid[ity]." He admitted "it was wrong for us to go in, but I don't have nothing against cops." He also acknowledged that it was "bad judgment" to enter the Capitol.

*Bauer's Interviews with the FBI*

On January 8, 2021, Bauer voluntarily spoke with two FBI agents. The interview was audio recorded. During the interview, Bauer said that as he walked up to the Capitol building from

---

[4]The government has not identified any video evidence of an officer shaking Bauer or Hemenway's hand.

Pennsylvania Avenue, he saw bicycle racks turned upside down and "there were people hanging off the scaffolding already." Despite the obvious chaos and rioting, he and Hemenway continued toward the building. When they were "about ten paces from the door," Bauer saw "six- or eight-armed S.W.A.T. team members." He said that they were "standing there with their arms folded and their weapons pointed at the ground." He saw "some younger guys that were throwing stuff at [the S.W.A.T. team members]." Bauer yelled at the rioters throwing things saying, "Hey, what the hell are you doing? They have stood down." Bauer said that he and Hemenway continued inside the building with a large crowd to "occupy the space." Bauer later reiterated, "I was not there to fight anybody, get physical. I was there to just occupy."

Once inside the building, Bauer claimed that a police officer shook his hand and said, "It's your house now." Bauer said that the officer was wearing a black uniform with some yellow on it but was not wearing tactical equipment. Bauer acknowledged that the officer "was probably in fear for his life" because he was "completely surrounded by people."[5]

Bauer said that he then went into a room with pillars and a 15-foot ceiling, which matches the description of the Crypt. He and Hemenway chanted, "Stop the Steal" with the crowd. He said that they exited the Capitol at about 3:00 p.m. through a ground-level door on the East side of the building.

Bauer told the FBI, "I don't feel like I done nothing terribly wrong," but acknowledged, "I don't agree with some things that went on." He said, "If I had been in a cop uniform on that day I would have been scared for my life."

On January 12, 2021, Bauer again spoke voluntarily with the FBI. During the interview, Bauer said that right after he exited the Capitol, he looked up at a balcony. He saw police officers

---

[5] The government has found no video evidence of this encounter taking place.

who had been teargassed and their "eyes were watering." He also admitted to deleting all his Facebook posts related to the riot, but said, "It's nothing y'all didn't have anyway."

*The Charges and Plea Agreement*

On January 14, 2021, Bauer and Hemenway were charged by complaint with violating 18 U.S.C. § 1752(a)(1) and 40 U.S.C. § 5104(e)(2). The next day, Hemenway was arrested in the Western District of Virginia. He was released on personal recognizance.

On January 22, 2021, Hemenway was charged by four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On June 28, 2021, Hemenway pled guilty to Count Four of the Information, charging a violation of 40 U.S.C. §5104(e)(2)(G), Parading, Demonstrating, and Picketing in a Capitol Building. By plea agreement, Hemenway agreed to pay $500 in restitution to the Department of the Treasury.

### III.   Statutory Penalties

Hemenway now faces a sentencing on a single count of 40 U.S.C. §5104(e)(2)(G). As noted by his plea agreement and the U.S. Probation Office, Hemenway faces up to six months of imprisonment and a fine of up to $5,000. As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.[6]

### IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford

---

[6] Because the defendant has pled guilty to a petty offense, a term of supervised release is not authorized. *See* 18 U.S.C. § 3583(b)(3).

adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a period of incarceration.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his individual conduct, as we now discuss, this Court should note that each individual person who entered the Capitol on January 6 did so under the most extreme of circumstances. This is exemplified by what Hemenway told the FBI he witnessed at the Capitol that day. Hemenway admitted to the FBI he saw overturned bike racks and a "Do Not Enter" sign as he approached the building. He described the inside of the Capitol as "f**king crazy" and "pretty f**king wild" and even questioned "what . . . we [were] doing" when he saw a rioter break into an office with family pictures in it. Make no mistake, Hemenway was not a mere tourist that day.

Additionally, while looking at each defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence;

(6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

Hemenway maintains that he went to the Capitol on January 6, 2021, because he supported former-President Trump and Trump invited the crowd to walk down Pennsylvania Avenue. As Hemenway descended on the Capitol, however, he knew that he should not be there. He saw first-hand that the area was out-of-control. Hemenway said that as he approached the Capitol, he "passed the barrier and there were people everywhere" and saw a "Do Not Enter" sign.

At multiple times, Hemenway had opportunities to leave. For one, Bauer's wife left to go back to their hotel. He could have joined her. His wife and child were already at the hotel as well. But he chose to stay. He chose to illegally enter the building.

While inside the building, Hemenway joined a mob of people and walked through the building from the Senate Wing Door, into the Crypt, down the OAP hallway, and to the Memorial Door. He took photographs. He chanted with the crowd. He watched a rioter break into an office and rioters assault police officers. He stayed for 17 minutes. Outside the building, Hemenway saw a rioter trying to break a window. Yet he stood on a military vehicle with his arms raised in triumph.

That said, Hemenway did express remorse for being part of this unparalleled crime, stating to the FBI that what he did was "wrong" and showed "bad judgment." But his remorse did not come when he left the Capitol. When left the Capitol, he stood on a U.S. government vehicle with his arms up in triumph. His remorse came when he realized he was in trouble.

Though he may not have participated in the violence and destruction that day, he was a vital part of the large mob of people who overwhelmed police officers, scared Congressional members and staffers, and led to a complete halt of the Electoral College Vote count.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. The History and Characteristics of Edward Hemenway

Hemenway has a serious criminal history, dating back to 2004. ECF 30, ¶ 26-27. Most notably, Hemenway pled guilty in 2006 to Sexual Battery and Criminal Confinement and was sentenced to 3 years imprisonment, all but 1 year suspended. *Id.* ¶ 26.[7] His probation was revoked, however, and he was re-sentenced to 5 years imprisonment. *Id.* As a result, he was incarcerated from 2008 to 2011. *Id.* ¶ 53. His parole term ended in 2013. *Id.* ¶ 26.

Since about 2011, Hemenway has been self-employed as a long-distance truck driver. His total monthly business income is $12,000, and his household income is $16,000 per month. *Id.* ¶¶ 52, 56.

Given Hemenway's serious criminal history, this factor weighs in favor of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[8] As with the nature and circumstances of the offense,

---

[7] According to the PSR, Hemenway was also charged with Rape, but that charge was dismissed. *Id.* ¶ 26.
[8] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20

this factor supports a sentence of incarceration. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected.") (statement of Judge Hogan).

### A. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by these defendants. 18 U.S.C. § 3553(a)(2)(B-C); *see also United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010) ("Subsections 3553(a)(2)(B) and (C) codify the penal goals of general and specific deterrence, requiring disincentives to match the severity of punishment to the harmfulness of the crime.").

#### i. *General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

Testimony.pdf

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demand deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

      ii. *Specific Deterrence*

On the one hand, Hemenway's behavior on January 6 highlights the need for deterrence. His decision to enter the Capitol building despite seeing the mayhem around him shows that he clearly knew his presence inside the Capitol was wrong. Even more troubling was his casual appreciation for the chaos surrounding him, such that he posed for a selfie in front of a mob of people and stood on a military-style vehicle outside the Capitol.

On the other hand, Hemenway apparently warned a rioter not to break a window. And he has shown remorse by acknowledging that going into the building was wrong and demonstrated "bad judgment." Additionally, his early acceptance of responsibility and willingness to cooperate with the FBI from the beginning does show a level of contrition for his behavior on January 6. In short, the question of deterrence here is multi-faceted. The demands of general deterrence favor incarceration, but the need for specific deterrence may be met with a less severe sentence.

**B. The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress. Each offender must be sentenced based on their individual circumstances, but with the backdrop of January 6 in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes.  A probationary sentence should not necessarily become the default.  Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097(PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is low, we have already begun to see meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. While those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home confinement. After a review of the applicable Section 3553(a) factors, the government believes that Hemenway's conduct falls in the latter category.

## V.    Conclusion

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a).  As detailed above, some of those factors support a sentence of incarceration and some support a more lenient sentence.  Balancing these factors, the government recommends that this Court sentence Edward Hemenway to three months home confinement, followed by a three-year period of probation to include 60 hours of community service, and $500 restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty because of his behavior, while recognizing his early acceptance of responsibility.

        Respectfully submitted,

        CHANNING D. PHILLIPS
        ACTING UNITED STATES ATTORNEY

By:   *Elizabeth Kelley*
      ELIZABETH C. KELLEY
      D.C. Bar No. 1005031
      Assistant United States Attorney
      U.S. Attorney's Office
      555 4th Street, N.W.
      Washington, D.C.  20530
      Office: 202-252-7238
      Elizabeth.Kelley@usdoj.gov